JOHNSON, J.
| ¶ Defendant/Appellant, Alcus A. Smith, appeals his convictions and sentences from the 24th Judicial District Court, Division “M”. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On February 26, 2015, Defendant and 20 other co-defendants were charged in a 30-count indictment for various acts of racketeering committed in furtherance of a narcotics distribution network on the West Bank of Jefferson Parish operated by a street gang known by its members as the “Harvey Hustlers.”[1] Specifically, Defendant was charged with racketeering, in violation of La. R.S. 15:1352 (count one), conspiracy to distribute cocaine, in violation of La.' R.S. 40:979 and La. R.S. 40:967(A) (count two), the second degree murder of Donte Hall, in violation of La. R.S. 14:30.1 (count seventeen), and possession with intent to distribute cocaine, in violation of La, R.S. 40:697(A) (count nineteen).[2] Defendant pleaded not guilty to the charged offenses at his arraignment on March 23, 2015.
On October 26, 2015, the trial court heard and denied Defendant’s motion to suppress wiretaps. Trial before a 12-per-son jury commenced against Defendant and co-defendant Williams on October 27, 2015. At trial, evidence was presented that this case arises from a federal investigation conducted by a task force identified as the Federal Bureau of Investigation (FBI) New Orleans Gang Task Force, comprised of federal and state officers, into drug trafficking in Jefferson Parish. Through *340 the investigation, law enforcement learned that a narcotics distribution network was being operated on the West Bank of Jefferson Parish by a violent street gang known as the “Harvey Hustlers.” It was discovered that members of this narcotics organization |awould obtain controlled dangerous substances transported into the New Orleans area from known source locations, including the State of Texas, from fellow gang members and other associates. The acquired narcotics were then converted into saleable form and provided to street level dealers working for the Harvey Hustlers, who in turn would sell the product for the profit of the gang’s members.
According to the testimony established at trial, while operating their narcotics network, the members of the Harvey Hustlers and their known associates committed various drug offenses and other criminal acts including, but not limited to, murder, solicitation to commit murder, obstruction of justice, and illegal possession of firearms. Witness testimony confirmed that co-defendant, Robert Williams aka “Lil Rob,” held a leadership role in the Harvey Hustlers and as such, directed the illegal activities of other gang members, while Defendant, Alcus Smith aka “Bug,” participated in the transportation and distribution of wholesale amounts of powder cocaine to Harvey Hustler members. Information regarding the inner workings of this criminal enterprise were further obtained from numerous wiretaps secured on cellular telephones belonging to co-defendant Williams, Defendant, and other members and/or associates of the Harvey Hustlers.
As a result of the multi-agency investigation, which spanned several years, 21 defendants were indicted in both federal and state courts and charged with over 50 acts of racketeering and 30 additional criminal offenses.
The specific facts adduced at trial surrounding the offenses for which Defendant and co-defendant Williams have been charged are as follows.

The drug trafficking investigation

FBI Special Agent Todd Schliem testified regarding the multi-agency investigation spanning the course of years of the Harvey Hustlers, recognized for extreme acts of violence associated with drug distribution in Jefferson Parish. According to Special Agent Schliem, the members of the Harvey Hustlers and their known associates totaled over 100 and their purpose was to make money through the |ssale of narcotics. He explained that in 2005—in the time period following Hurricane Katrina—there was a limited supply of narcotics available in Jefferson Parish, with one exception. In the Scottsdale neighborhood on the West Bank of Jefferson Parish, the Harvey Hustlers were able to establish and/or maintain a significant drug supply, thereby creating high demand for their product. Special Agent Schliem noted that from that time forward, the Harvey Hustlers exerted influence in Scottsdale and other neighborhoods in Jefferson Parish, establishing a hierarchy inside their gang.
Co-defendant’s brother, David Williams aka “Mr. Harvey,” was identified as the leader of the Harvey Hustlers until his murder in 2010. It was discovered that during the time period when the Harvey Hustlers were experiencing very profitable drug sales, there was an internal strain amongst the gang members vying for leadership positions. A “civil war” broke out, dividing the group into those who supported David Williams and those who supported brothers Melvin and Jermaine Hudson. Special Agent Schliem described the events leading up to David Williams’ murder as a “domino effect” beginning with the murder of Chad Jones, a close associate of David Williams. He explained *341 that when David Williams discovered that a fellow gang member by the name of Laval London had participated in Jones’ murder, David Williams had London killed in retaliation. Consequently, in retaliation for the murder of London—who was a close associate of the Hudson brothers— David Williams was killed.[3] During this turmoil, the Harvey Hustlers separated into subgroups based on their identified loyalties. Those loyal to the Hudson brothers grouped into subsets of the gang identified as the “Murder Squad” and the “Young, Black and Successful” (YBS), while those loyal to David Williams and his brother, co-defendant Williams, identified as “HH.”
Based on the investigation into the members of the Harvey Hustlers, approximately ten federal and state court indictments were obtained resulting in over 142Q convictions. At the time the state and federal indictments were returned, co-defendant Williams was recognized as one of the leaders of the Harvey Hustlers.
Several investigative techniques were employed while conducting the investigation into the Harvey Hustlers, including basic surveillance, analysis of phone records, witness interviews, use of confidential informants, controlled narcotics purchases, and wiretaps. Among the relevant wiretaps were those placed on the cellular telephones of co-defendant Williams, co-defendant Williams’ brother, Clifford Son-nier, and Nathan Carter beginning in October of 2013. Special Agent Schliem identified for the jury numerous intercepted phone calls purported to capture the voices of co-defendant Williams and/or Sonnier and their alleged associates. Specifically, testimony was elicited regarding a November 6, 2013 intercept wherein co-defendant Williams received a phone call from an unidentified female who alerted him that the police had been by his residence at 1104 Clydesbank and reminded him that he “put his mojo [synthetic marijuana] in there.” Co-defendant Williams then replied, “[y]ep and my hammer,” which Special Agent Schliem explained is street vernacular for a firearm. Special Agent Schliem noted that the referenced firearm was stolen and had been seized from the residence by Detective John Wiebelt.
Detective Wiebelt of the Jefferson Parish Sheriffs Office (JPSO) confirmed that on November 6, 2013, he assisted in an eviction at 1104 Clydesbank. The home was unoccupied, and inside, officers seized a firearm and a black bag containing synthetic marijuana (also known as “mojo” or “gas”) and a digital scale. It was discovered that the firearm seized had been stolen.[4]
Special Agent Schliem also identified various phone calls and text messages exchanged between members of the gang and their known associates including Defendant and Sonnier, leading up to a meeting to conduct a drug transaction at a daiquiri shop in Harvey, Louisiana, on November 18, 2013.
jfiThe relevant intercepted communications began with a text message sent by Sonnier to Carter at 2:55 p.m., in which Sonnier texted Carter: “Sup Big Homie.” At 3:10 p.m., Carter responded, “I’m ’bout to call him.” Carter then sent another text *342 message to Sonnier that said: “he ’bout to call you from a 758 num.” Special Agent Schliem noted that “758”. is the .first three digits of the phone number used by Defendant. A phone call was then made at 3:17 p.m,, by Defendant wherein he told Sonnier, “Nathan gave me your number” and Sonnier told Defendant, “give me three of them,” prompting Defendant to respond, “like last time.”[5] Two subsequent conversations between Sonnier and an unidentified .female reflect Sonnier’s effort to obtain “about $1500.” Then, at 5:29 p.m. Defendant texted Sonnier, “I’m ready when you ready.” Sonnier then texted Defendant at 5:55 p.m. inquiring as to his whereabouts, to which Defendant responded, “I’m on Ames.” Sonnier informed Defendant that he was at the daiquiri shop, and Defendant replied, “K. On my way.” Meanwhile, a phone call was also intercepted between Sonnier and Willie Thornton during which Sonnier told Thornton that he wanted him to “work his magic for me”[6] and that he will pick him up. At 6:17 p.m., Sonnier asked Defendant where he was and advised him that he was turning on Manhattan Boulevard at Lapalco, to which Defendant informed Sonnier that he was “about to pull up there.”
■FBI Agent Lon Boudreaux testified that he participated in the wiretap surveillance of the phones belonging to co-defendant Williams and Sonnier on November 18, 2013. Based on the content of the phone calls, officers monitored the movements of Sonnier’s Mazda. During the course of the surveillance, Agent Boudreaux testified that he observed activity consistent with narcotics trafficking. Agent Boudreaux testified that at one point, he followed the Mazda to a daiquiri shop at Lapalco and Ames Boulevard' where a meeting took place. At the daiquiri shop, fyAgent Bou-dreaux observed a red Malibu ' pull-up alongside the Mazda and throw an object into the Mazda. Finding this activity suspicious, officers followed the red Malibu before receiving a phone call from Special Agent Schliem regarding a second meeting and delivery of narcotics that was scheduled to occur at another , daiquiri shop on Manhattan Boulevard. ■
Upon arrival, Agent Boudreaux observed the Mazda pull into the parking lot and noticed Sonnier standing outside talking to Thornton.[7] A few minutes later, co-defendant Williams walked out of the daiquiri shop, and a Nissan sports car pulled in and parked across from Sonnier’s vehicle. Defendant exited from the driver’s side of the Nissan.[8] According to Agent Boudreaux, Defendant approached Sonnier and spoke to him.[9] Defendant then escorted Thornton back to his vehicle where two other unidentified individuals exited the Nissan and served as “lookouts,” while *343 Thornton and Defendant got into the car. Approximately one minute later, Thornton exited the Nissan and went back to where co-defendant Williams and Sonnier were standing. After a time, co-defendant Williams, Thornton, Sonnier, and an, unidentified female entered the Mazda with Brandon Motton behind the wheel. The vehicle then departed followed by.intercepting undercover police units, A high-speed chase ensued during which a text message was intercepted between Sonnier and Defendant that read, “you serious fool?” After the chase, Agent Boudreaux indicated that Thornton and Motton were apprehended, but the remainder of the occupants in the vehicle evaded officers on foot.
On cross-examination, Agent Boudreaux testified that on a couple of previous occasions, he had seen co-defendant Williams and.Sonnier “drive around all night stopping at one location and the next,” and that based on the wiretaps, it was concluded that they were participating in drug transactions.
|7The high-speed chase was explained in greater detail by Detective Anthony But-tone of the JPSO, who testified that on November 18, 2013, at approximately 6:30 p.m., he participated in a joint investigation with the FBI in which a> mobile surveillance of a daiquiri shop, on Manhattan Boulevard and the West Bank Expressway, was conducted. Pursuant to the surveillance, Detective Buttone, along with Agent Mike Tucker and Lieutenant Kevin Decker—each in separate unmarked police units—followed a silver Mazda as it exited the parking lot of the daiquiri shop. After having observed several traffic infractions, Detective Buttone elected to conduct a traffic stop. Detective Buttone testified .that the Mazda stopped briefly before it sped off. A high-speed chase ensued, and sight of the vehicle .was lost for a brief period of time. The Mazda was ultimately discovered in a driveway at 917 Drake Avenue, where it had been abandoned. Inside the vehicle, the officers seized two plastic bags containing what appeared to be marijuana,[10] sandwich hags containing a razor blade, a digital scale, and crack cocaine.[11] The driver, Brandon Motton, and a passenger, Willie Thornton, were found hiding nearby and were taken into custody.
Detective William Roniger of the JPSO also participated in the high speed chase and arrests of Motton[12] and Thornton. On the evening of their apprehension, Detective Roniger testified that his role was to monitor the telephone wiretap surveillance of cellular phones registered to co-defendant Williams and Sonnier and to participate, in the mobile surveillance of the Mazda. Detective Roniger testified that during the chase, information was gleaned from .communications on the wiretap that provided some indication of the actions of the individuals inside the Mazda. This information included the whereabouts of co-defendant Williams and Sonnier in the immediate aftermath of the chase, as well as information regarding objects that may *344 | Rhave been thrown from the Mazda during the chase.
Accordingly, a search of the route taken by the Mazda during the chase was conducted resulting in the recovery of various photographs, 128 grams of cocaine, four grams of crack cocaine, and a Glock firearm—later learned to have been reported stolen. Detective Roniger further testified on cross-examination that based on co-defendant Williams’ own admission heard on the wire intercepts, he believed co-defendant Williams was the only person inside the Mazda to have possessed the firearm that was recovered.[13] Detective Roniger also testified regarding several “controlled buys” he oversaw between his confidential informant and members of the Harvey Hustlers including Thornton, Kei-trel Gumms, Richard Chess, Carlnell Pierce, and Corey Trent.[14]
Special Agent Schliem was recalled and testified that prior to the meeting at the daiquiri shop in November of 2013, communications were intercepted demonstrating Sonnier’s intent to acquire narcotics. He further indicated that after the meeting at the daiquiri shop and during the high-speed chase between the officers and the Mazda, a text message was sent between Sonnier and Defendant. The text message read, “U serious fool?” Later that evening, Sonnier then sent a text message to an unknown person writing, “[m]an, dis sum crazy s**t. I think n***er jus try to set me up. I jus went spent 5,000 wit him. We met on Manhattan. By time I made it to Ames I was getting pull o.” Agent Schliem noted that $5,000 would be enough money to purchase the 4.5 ounces of cocaine discarded from the Mazda and seized from the side of the road following the chase. Another text message, also sent by Sonnier that same evening, to another unidentified individual stated, “[m]an, my f**king lil world so |gcrazy, bruh. I jus got n a high-speed chase bout a hour ago. Took a lost for 5 racks.[15] Well, I hope its not a lost. I gotta go find it. I think n***er tried 2 set me up. I knew I shouldve brought u dat money. My nerves so bad. Got the car towed & all.”
The day after the chase, November 19, 2013, a text message from Sonnier to Nathan Carter—an associate/business partner of Defendant—was intercepted. In the text message, Sonnier wrote to Carter, “[e]an you meet me sumwea big son i need to holla at u str8up,” to which Carter replied, “[b]e down there this weekend.” Approximately four minutes later, Sonnier responded to Carter, “Son, bull[16] told u wat happen?” to which Carter replied “Yea.” Next, Sonnier then texts, “Big son, that was all I had son, nolie && dey towed my gurí s. I’m n dis lil rat motel wit nutlO. Feel me. Cnt go hme. Scared dey gon cum dea. I need u tho so,” to which Carter responded, “Ima hit u when I come down,” prompting Sonnier to reply, “Imma just *345 lay low till u cum thru son dis s mad crazy.”
In addition to these text message communications, Special Agent Schliem testified that telephone calls were also intercepted following the chase. In these communications, co-defendant Williams was heard admitting to his participation in the event, as well as to his possession of a firearm, aka a “hammer,” and to having pointed the firearm at Motton in order to compel him to evade the police. Specifically, co-defendant Williams was heard talking about Sonnier’s vehicle, the Mazda that was searched by the police, saying, “[t]hey ain’t nothing in there, though. They ain’t got nothing in it, but we got beaucoup pictures and s**t int here.” In the pictures referenced by co-defendant Williams, various members of the Harvey Hustlers, including co-defendant Williams, Sonnier, Motton, Tavaris Arbuthnot aka “T-row,” Ray Woodruff, Isaac Smith, Frankie Hoofkin, Walter Wright, Kerry Reynard, Richard Chess, Keitrel Gumms, Cornell Harris, and Kevin Simmons, are |1ftdepicted. Some of the gang members are seen wearing chains with the letters “HH”[17] for Harvey Hustlers or “SD” for Scottsdale. In another phone call, Sonnier was heard explaining to co-defendant Williams that when he went back to search for the gun and/or drugs that were thrown from the Mazda during the chase, the West-wego Police Department pulled him over and issued him a traffic citation and then let him go.
Willie Thornton testified under legal compulsion, pursuant to Louisiana Code of Criminal Procedure Article 439.1. Thornton testified regarding his three prior felony convictions and his pending criminal offenses charged in the same indictment as co-defendant Williams and Defendant. Thornton told the jury that he had been incarcerated since November 18, 2013, following a high-speed chase with the police. At the time of his arrest, Thornton was with Motton aka “Pudgy,” Sonnier aka “Dut or Dirty,” and co-defendant Williams, whom he referred to as “Rob.” Thornton explained that co-defendant Williams and Sonnier are brothers, and he knew them from growing up together in the same neighborhood.
Thornton explained that in November of 2013, he was a passenger in the Mazda driven by Motton when they attempted to evade the police. He denied seeing co-defendant Williams point a gun at Motton during the pursuit or order him to drive off from the police but admitted to there being a quantity of “mojo” in the car. Thornton further denied any acquaintance with Defendant and, thus, denied taking possession of cocaine from Defendant at the daiquiri shop prior to entering Mot-ton’s car and engaging in the high-speed chase. Thornton told the jury that he knew of the Harvey Hustlers, but in his opinion, he did not believe they were an organized group with an identifiable leader. Thornton named Melvin Hudson, Germain Hudson, Tedrick Bernard, Paul Smith aka “Buck,” Ellis Landix, Jr., and Corey Trent, as members or associates of the Harvey Hustlers.
Brandon Motton also testified under legal compulsion, pursuant to Louisiana Code of Criminal Procedure article 439.1. Motton admitted to having prior felony |ndrug convictions and to being charged in the same indictment as co-defendant Williams and Defendant. He too testified *346 that he was arrested following a police chase in November 2013 but denied being in the Mazda during the chase, Motton explained that at the time of his arrest, he was in the Day Development'Subdivision in Westwego and was hiding from the police because he was on parole, further maintaining that he was not with co-defendant Williams, Sonnier, or Thornton prior to his arrest. He did however admit to knowing co-defendant Williams and Sonnier.
Paul Smith testified that he was indicted along- with co-defendant Williams and pleaded guilty to charges of racketeering, conspiracy to distribute cocaine, conspiracy to distribute heroin and marijuana, possession with intent to distribute oxycodone, and possession with intent to distribute cocaine. He further admitted to being an active participant in the Harvey Hustlers through which he engaged in various criminal acts which included obtaining and selling narcotics. He testified that he did' not “recall” co-defendant Williams being a member of the group. When the State confronted Smith with the factual basis made as part of his guilty plea, he testified that he did not “recall” accepting as true the statement that “Members of the Enterprise who engaged in this activity on a daily basis ... included ... Robert ‘Lil Rob’ Williams.” It was further established that,' at the time of his guilty plea, he swore as true that “Enterprise members' and their associates engaged in acts of violence to protect the perceived interests, of the Enterprise members, exact revenge upon enemies of the Enterprise members,, punish Enterprise members whose conduct displeased Enterprise leaders and 'to develop, the reputation of the Harvey Hustlers as a. group to be feared by. members of the community,”
Harry Smoot testified that he pleaded guilty in federal court to several charges related to drug-trafficking conspiracy that took place between Januáry 1, 2010 through November 20, 2013, wherein he conspired with co-defendant Williams, Son-nier, Frankie Hoofkin, Ray Woodruff, Terrence Kelley; and others to sell drugs. He admitted that, during the course of the conspiracy, he provided drugs, including 1^heroin, cocaine, and marijuana, to other individuals who participated in the conspiracy with the objective towards monetary gains. He testified that he distributed large quantities of drugs to other “small time drug dealers” associated with the Harvey Hustlers, including Keitrel Gumms, Kerry Reynard, Richard Chess, and Bryant Gumms at co-defendant Williams’ behest. Smoot testified that at times he saw co-defendant Williams with large sums of money but could not state whether the money was related to any drug transactions. He further testified that co-defendant Williams provided him with some “support and protection” as he transacted his drug business,
Torey Richardson testified that he was incarcerated on federal convictions for “conspiracy to possess firearms, RICO conspiracy and conspiracy to possess 280 grams or more of crack cocaine.”[18] Richardson told the jury that he sold drugs obtained from various members of the Harvey Hustlers, including Melvin Hudson, Germain Hudson, Paul Smith, and David Williams. During that time, he also observed co-defendant Williams sell cocaine “a few times” and claimed to know that co-defendant Williams supplied “slabs *347 of cocaine”[19] to other members of the Harvey Hustlers.
Tedrick Reynard was also incarcerated at the time of trial for various federal drug related convictions.[20] Reynard testified that he was a drug dealer in the Scottsdale/Harvey area for eight to nine years. During that time, he was provided with drugs supplied by members and associates of the Harvey Hustlers. Among his suppliers were co-defendant Williams, David Williams, and Melvin Hudson. He acknowledged that at some point a dispute amongst members of the gang broke out and, as a result, David Williams was killed. He testified that after David Williams was killed, co-defendant Williams stepped forward to “run things.” He stated that co-defendant Williams was “feared,” and, thus, people listened to him.
ha The transportation of narcotics from Texas to Louisiana
Donald Nance, former State Trooper with the Jefferson County Sherriffs Office in Texas, testified .that on April.6, 2014, he received a call from Drug Enforcement Agency (DEA) Agent Mike Lumpkin regarding two vehicles, traveling from Houston on Interstate-10 in the direction of New Orleans, suspected to be carrying contraband. Sergeant Nance was able to locate the caravanning vehicles and effect a stop based on the information he received. Sergeant Nance testified that one of the vehicles—an Acura MDX—was driven by Defendant and inside a “hidden compartment” within the vehicle was $13,000.[21] Detective Eric Bowman, also of the Jefferson County Sheriffs Office, assisted Sergeant Nance in the stop of the vehicles and testified that the second vehicle was driven by Joseph Holmes and was found to contain eight “bundles” of “drugs,” later confirmed to be cocaine, hidden underneath the front bumper.[22] Detective Bowman testified that Holmes indicated he was traveling from Texas to Harvey, Louisiana.
Pursuant to the stop by Sergeant Nance and Detective Bowman, Holmes was arrested and pleaded guilty to possession with intent to distribute narcotics. Holmes testified that he and Defendant were traveling together in separate vehicles from Houston, Texas, to .Harvey,. Louisiana. He stated that he was transporting the cocaine in his vehicle, as he had done on prior occasions, pursuant to his business agreement with Defendant and Nathan Carter. Holmes explained that he would drive from Harvey to Houston and back after retrieving at least 20 kilograms of cocaine per month,[23] paid for by Defendant [24] and on occasion, Carter. He further testified that on his return trip he would always travel with a second vehicle, whose purpose was to serve as a “look-out.”
*348 [^Marlon Mercy also testified that he pleaded guilty to charges of racketeering and conspiracy to distribute cocaine in connection with his involvement in the procurement of cocaine to be transported between Texas and Jefferson Parish, Louisiana. He testified that while living in Texas, he worked with Defendant and Carter to obtain multiple kilograms of cocaine ranging in price from $27,500 and $28,000 per kilogram. Mercy testified that on the day of Defendant’s and Holmes’ arrests, they had obtained cocaine from him in Houston at a man known as “Payday’s” apartment. He explained that Defendant tested the product to ensure its quality and then gave him money for the cocaine.
Nathan Carter testified that he too was incarcerated for having pleaded guilty to racketeering and conspiracy to distribute cocaine. Carter confirmed that he was involved with Defendant, Mercy, and Holmes in the distribution of cocaine from Texas to Jefferson Parish, Louisiana. He stated that, between November of 2013 and April of 2014, the group transported more than 20 kilograms of cocaine per month to Jefferson Parish. Once the cocaine was transported to Jefferson Parish, Carter testified that it was then sold at $81,000 per kilogram. He testified that once in Jefferson Parish, Defendant distributed the cocaine to Sonnier. Carter told the jury that one time Sonnier complained to him that he had been involved in a police chase in November of 2013, which resulted in the loss of the cocaine he had obtained from Defendant.

Wiretap intercepts

FBI Special Agent Keith Burriss testified as an expert in the field of drugs, weights, prices, distribution of drugs, drug-trafficking, and drug-trafficking organizations. He explained to the jury that he monitored the wiretaps on co-defendant Williams and Sonnier’s cellular phones in 2013. While monitoring co-defendant Williams’ phone conversations in November of 2013, Agent Burriss identified a conversation in which co-defendant Williams and a male named “Minny” discussed the need to “smoke somebody” named “Tosh.” Agent Burriss relayed this | ^information to Detective Roniger, who then took the referenced individual into custody. In another call, Agent Burriss testified that he heard co-defendant Williams advise a caller that he would be able to supply him with a “hundred dollars’ worth” of cocaine since the caller had run out of his supply. Agent Burriss further testified regarding a phone call to co-defendant Williams in which the caller asked about purchasing an ounce of cocaine, to which co-defendant Williams replied, “[o]n Dirty level, not my level.” Agent Burriss believed that to mean that such quantity is not what co-defendant Williams “typically does, it’s going to be whatever Dirty typically does.” In the same call, co-defendant Williams also noted that an ounce of cocaine would cost $1,100. Agent Burriss explained to the jury that with respect to narcotics trafficking in general, 20 kilograms of cocaine could net a profit of $450,000 per month.
Detective Roniger confirmed that he was the affiant on the wiretaps obtained on the phones belonging to co-defendant Williams and Sonnier. He testified that while monitoring co-defendant Williams’ phone, information was received regarding a potential threat to Tosh Toussaint’s life at the direction of co-defendant Williams. Toussaint was ultimately taken into custody on unrelated criminal charges and afforded protection based on the content of the intercepted phone call.
FBI Special Agent Schliem was recalled and testified' regarding multiple wiretapped conversations amongst the *349 members of the conspiracy.[25] Special Agent Schliem testified that among the wiretapped conversations were those between Defendant, Carter, Marlon Mercy, and Holmes regarding the exchange of money to pay for approximately 20 kilograms of cocaine each month from a supplier in Houston to be transported back to Jefferson Parish. He also testified regarding multiple phone communications involving co-defendant Williams, Keitrel Gumms, Sonnier, and Ray Woodruff relating to drug trafficking and a shooting that occurred at hfithe Lapalco Apartments on April 22, 2013,

The Murder of Donte Hall

Detective Travis Eserman of the JPSO testified that he was the lead investigator assigned to the November 16, 2013 shooting death of Donte Hall, whose body was found outside of 2629 Pelican Bay Boulevard, Marrero, Louisiana. Detective Eser-man testified that Hall was shot at approximately 7:00 p.m. in the middle of the street in a residential neighborhood and that Defendant was developed as a suspect. At the scene of the homicide, firearm casings were recovered and preserved for analysis. Additionally, three residences with security camera views of the homicide scene were retrieved and analyzed. Hall’s cell phone records were also obtained,[26] and it was noted that there were over 50 phone calls between phones registered to Hall and Defendant on the day before his murder and on the day of his murder. There were also numerous, phone calls between Hall and Leroy Bird, a close friend of Hall, who advised Detective Eserman of Hall’s activities leading up to his murder. Information provided by Bird led Detective Eserman to an apartment in the St. Germaine Apartment Complex, Apt. F-301, .used by Defendant. After speaking with the leasee of-the apartment—Robin Toussaint—Detective Eserman obtained Defendant’s phone number and then-his cell phone records. From the phone records it was determined that the last phone call between Defendant and Hall was at 6:41 p.m., approximately 19 minutes before Hall was murdered.
Robin Toussaint testified that she rented an apartment at the direction of Defendant[27] at the St. Germaine Apartment Complex located at 2101 Manhattan Boulevard, apartment F-301.[28] Ms. Toussaint never lived at the apartment but was asked by the' apartment manager to come to the apartment to speak with the police about' a murder investigation, at which time she provided the police with Defendant’s 117phone number and identified Smith from a photograph.
Leroy Bird, a friend of Hall’s and an incarcerated felon serving 15 years in prison, testified that Hall introduced him to Defendant, who would supply him with cocaine which he would then sell. He testified that he spoke to Hall less than an hour before Hall’s murder and that during their conversation, Hall told him he was “going to go ride with Bug [Defendant].” He explained that the day before Hall’s murder, Hall had set up a drug deal between Defendant and another individual, *350 but instead of. conducting the drug transaction, Defendant had been robbed and thus believed Hall “had something to do with it." He further testified that on .the day Hall was murdered, he warned Hall not to go with Defendant, to which Hall replied, “I’m not going to let that p***y a** kill me .., if he come by hisself [sic], I’m going to go with him. If he come with people in the car, I ain’t going with him.” Bird attempted to call Hall approximately 30 minutes after their conversation but received no answer. Thus, when Bird learned of Hall’s murder, he informed the police where Defendant lived, admitting that he wanted to kill Defendant himself for what he had done.
Maya Jackson testified that she was acquainted with Defendant and Hall, She testified that she was with Hall on the evening of his murder and saw Defendant pick up Hall in a black Infiniti.[29] She also noticed a white vehicle speed off behind Defendant’s vehicle after picking up Hall.[30]
Nathan Carter'-also told the jury that four hours prior to Hall’s murder, he spoke to Defendant who informed him that Hall had “set him (Defendant) up to be ripped off in a drug transaction,” and that he intended .on “getting him back.” Carter took this to mean that Defendant was going to “rob, harm, or kill” Hall, so he advised him “not to do it.” The next time Carter spoke with Defendant he indicated to him 1 isthat “it was done,” and “no one knew he had done it and that he didn’t have anything to worry about.”[31]
Jene Rauch of the JPSO Crime Laboratory testified as an expert in firearm and toolmark identification and shooting incident reconstruction. Based upon her analysis of the ballistics material in the Hall shooting, she concluded that “at least three guns” were discharged at the scene. The casings were, consistent with having been fired from at least one 9 mm weapon and two ,40 caliber weapons.
At the conclusion of the trial on November 6, 2015, the jury returned verdicts of guilty as charged on all counts against Defendant except on count seventeen, the second degree murder of Donte Hall, which resulted in a hung jury.[32],[33] On November 18, 2015, the trial court heard and denied Defendant’s motion for new trial. Immediately thereafter, and after a waiver of. delays, the court sentenced Defendant on count.one (racketeering) to 50 years imprisonment at hard labor; count two (conspiracy to distribute cocaine), 15 years imprisonment at hard labor; ■ and count nineteen (possession with intent to distrib *351 ute cocaine), 30 years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for the first two years of the sentence. The court further ordered all of Defendant’s sentences to run concurrently with each other.
On November 30, 2015, the State filed a habitual offender bill of information on count one, alleging Defendant to be a second felony offender. On December 9, 2015, prior to the habitual offender proceedings, Defendant filed a motion for appeal, “as to the convictions returned on November 6th 2015 and the sentences imposed on November 18,2015.”
A hearing was held on the habitual offender bill on December 17, 2015, after which the trial court adjudicated Defendant to be a second felony offender. On the Jásame date, the trial court vacated Defendant’s sentence on count one, and resen-tenced him as a second felony offender, pursuant to La. R.S. 15:529.1, to 65 years imprisonment at hard labor, without the benefit of probation or suspension of sentence. The court further ordered Defendant’s enhanced sentence on count one to run .concurrently with any other sentences he was already serving.
The trial court grantéd Defendant’s motion for appeal following his resentencing on the habitual offender bill on December 17,2015. The instant appeal follows.
ASSIGNMENTS OF ERROR
On appeal, Defendant alleges the trial court erred: 1) in -failing to grant the ■motion to suppress the wiretap; 2) in failing to grant the motion for new trial based on the insufficient evidence presented on count nineteen; 3) in failing to grant the mistrial when -improper contact was had between a juror and the prosecutor; and 4) by imposing an excessive sentence that was disproportionate to the sentence of co-defendant Williams.
LAW AND ANALYSIS
Denial of Motion for New Trial[34]
Defendant asserts the State failed to present- sufficient evidence to establish that he possessed cocaine with the intent to distribute on November 18, ‘2013—the crime alleged in count nineteen. Specifically, Defendant maintains that neither actual nor constructive possession of cocaine by Defendant was supported by the evidence presented at trial and, thus, concludes the eleménts of the crime were not proven beyond a reasonable doubt. Accordingly, Defendant avers that the trial court erred in failing to grant his motion for new trial based upon the sufficiency of evidence for the | ^charge of possession with intent to distribute cocaine.
Conversely, the State argues that the evidence it presented proved beyond a reasonable doubt that Defendant possessed cocaine with the intent to distribute on November 18, 2013.,
On November 17, 2015, Defendant filed a motion for new trial claiming the verdict *352 on count nineteen was contrary to the law and evidence as the testimony adduced was clear that no witnesses observed him in possession of cocaine on November 18, 2013, and therefore, he could not have possessed cocaine with the intent to distribute on that date.[35] The denial of a defendant’s motion for new trial, based on La. C.Cr.P. art. 851(B)(1), presents nothing for review on appeal. State v. Hampton, 98-331 (La. 4/23/99); 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Condley, 04-1349 (La. App. 5 Cir. 5/31/05); 904 So.2d 881, 888, writ denied, 05-1760 (La. 2/10/06); 924 So.2d 163. However, the Louisiana Supreme Court and this Court have addressed the constitutional issue of sufficiency of the evidence under such circumstances. See Hampton, supra; Condley, supra; State v. Lyles, 03-141 (La. App. 5 Cir. 9/16/03); 858 So.2d 35; State v. Pascual, 98-1052 (La. App. 5 Cir. 3/30/99); 735 So.2d 98. Therefore, we find that the denial of Defendant’s motion for new trial based on the sufficiency of the evidence is properly before this Court on review.
The ruling on a motion for new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only where there is a clear showing of abuse of that discretion. State v. Battie, 98-1296 (La. App. 5 Cir. 5/19/99); 735 So.2d 844, writ denied, 99-1785 (La. 11/24/99); 750 So.2d 980. The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence | a,in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Ortiz, 96-1609 (La. 10/21/97); 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85 (La. App. 5 Cir. 5/26/04); 875 So.2d 949, 954-55, writ denied, 04-1605 (La. 11/15/04); 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Under the Jackson standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. State v. Flores, 10-651 (La. App. 5 Cir. 5/24/11); 66 So.3d 1118, 1122. Rather, the reviewing court must decide whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Id.; State v. Holmes, 98-490 (La. App. 5 Cir. 3/10/99); 735 So.2d 687, 690.
It is not the function of the appellate court to assess credibility or re-weigh the evidence. State v. Smith, 94-3116 (La. 10/16/95); 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03); 858 So.2d 80, 84, writ denied, 03-2745 (La. 2/13/04); 867 So.2d 688. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’ testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. State v. Caffrey, 08-717 (La. App. 5 Cir. 5/12/09); 15 So.3d 198, 202, writ denied, 09-1305 (La. 2/5/10); 27 So.3d 297.
*353 Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La. App. 5 Cir. 5/31/05); 904 So.2d 830, 833. In other words, circumstantial evidence is evidence which proves a fact, and from that fact one may indirectly but reasonably and logically conclude another fact which is sought to be proven. State v. Khanh Le, 13-314 (La. App. 5 Cir. 12/12/13); 131 So.3d 306, 313.
| asWhen circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” State v. Wooten, 99-181 (La. App. 5 Cir. 6/1/99); 738 So.2d 672, 675, writ denied, 99-2057 (La. 1/14/00); 753 So.2d 208. This is not a separate test from the Jackson standard but rather provides a helpful basis for determining the existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La. App. 5 Cir. 2/26/02); 811 So.2d 1015, 1019.
In this case, Defendant challenges his conviction on count nineteen, possession with intent to distribute cocaine, a violation of La. R.S. 40:967. To prove that offense, the State was required to show that Defendant knowingly and intentionally possessed cocaine and that he did so with the specific intent to distribute it. State v. Clark, 05-61 La. App. 5 Cir. 6/28/05; 909 So.2d 1007, 1011-12, writ denied, 05-2119 (La. 3/17/06); 925 So.2d 538. Guilty knowledge is an essential element to the crime of possession of contraband, and such knowledge may be inferred from the circumstances. State v. Manson, 01-159 (La. App. 5 Cir. 6/27/01); 791 So.2d 749, 761, writ denied, 01-2269 (La. 9/20/02); 825 So.2d 1156. Possession can be either “actual” or “constructive.” State v. Brisban, 00-3437 (La. 2/26/02); 809 So.2d 923, 929, writ denied, 03-3054 (La. 12/10/04); 888 So.2d 824.
Here, Defendant claims the State failed to prove his actual and/or constructive possession of cocaine on November 18, 2013. Since the only statutory element of the crime challenged by Defendant is the element of possession, the sufficiency of the evidence with respect to the remaining statutory elements need not be addressed. See State v. Henry, 13-558 (La. App. 5 Cir. 3/26/14); 138 So.3d 700, 715, writ denied, 14-0962 (La. 2/27/15); 159 So.3d 1064; State v. Ramirez, 09-350 (La. App. 5 Cir. 12/29/09); 30 So.3d 833, 840; State v. King, 05-553 (La. App. 5 Cir. 1/31/06); 922 So.2d 1207, 1211-13, writ denied, 06-1084 (La. 11/9/06); 941 So.2d 36.[36]
Although Defendant was not found in actual possession of the cocaine on November 18, 2013, we find he was at least in constructive possession. A person not in physical possession of a drug may have constructive possession when the contraband is under the person’s dominion and control. State v. Schieffler, 00-1116 (La. App. 5 Cir. 2/13/02); 812 So.2d 7, 9, writ denied, 02-0712 (La. 9/13/02); 824 So.2d 1188. The key factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession are the defendant’s knowledge that illegal drugs were in the area, his relations with a per *354 son found to be in actual possession, the defendant’s access to the area where the drugs were found, evidence of recent drug use by the defendant, the existence of drug paraphernalia, and evidence that the area was frequented by drug users. Id.; Manson, 791 So.2d at 761. After considering these factors, we find that the circumstantial evidence presented at-trial established that Defendant exercised sufficient constructive possession of the cocaine to find him guilty of the offense.
The jury heard detailed testimony concerning the facts and circumstances leading up to the November 18, 2013 meeting at the daiquiri shop on Manhattan Boulevard, which formed the basis for the challenged conviction.-. Specifically, in the weeks leading up to the daiquiri shop meeting between Defendant and co-defendant Williams’ cohorts, surveillance of co-defendant Williams and Sonnier established their involvement in other narcotics transactions utilizing the same modus op-erandi as the one engaged in with Defendant on November 18, 2013. Agent Bou-, dreaux testified that like the meeting at the daiquiri shop, the previous narcotics transactions also began with intercepted phone conversations establishing a meeting location, and then once at the location, Sonnier would exit the vehicle, “go in the other person’s vehicle for a very short period of time,-and then return'and then depart.” Agent [^Boudreaux testified that the amount of time Sonnier would remain in the other person’s vehicle was consistent-with the amount of time it would take to conduct a hand-to-hand drug transaction. The testimony further established that the November 18, 2013 meeting with Defendant was no different.
On the day in question, several intercepted text and phone communications between Defendant and Sonnier confirmed their meeting location at the daiquiri shop on Manhattan Boulevard. Through the intercepted communications, the duo confirmed the quantity of cocaine to be purchased. In the meantime, Sonnier’s effort to obtain money for the transaction was also intercepted along with a phone call to Willie Thornton, during which he advised Thornton that they would be obtaining cocaine for which he needed Thornton’s assistance in cooking it down into crack cocaine. Thus, the evidence established that Thornton accompanied Sonnier and co-defendant Williams to the daiquiri shop, where, as planned, Defendant arrived to meet them.
Based upon these intercepted communications, surveillance was put in place at the daiquiri shop. Upon Defendant’s arrival, Agent Boudreaux positively identified Defendant as he exited his vehicle and approached Sonnier who was standing outside talking to Thornton. He noted that Defendant was very “observable” due to the stark contrast between Defendant’s short stature as compared to co-defendant Williams, Sonnier, and Thornton. Agent Boudreaux further told the jury that after speaking to Sonnier, 'Defendant then escorted Thornton back to his vehicle where two other unidentified individuals exited Defendant’s Nissan and served as “lookouts” while Thornton and defendant got into the car. Approximately one minute later, Thornton exited the Nissan and went back to where co-defendant Williams and Sonnier were standing. Based on 'the wireless intercepts and his observations at the daiquiri shop, Agent Boudreaux testified that he believed Defendant sold’ drugs to Thornton and his associates,
[gsThe evidence further established that after the narcotics transaction, Sonnier’s vehicle left the daiquiri shop and a high-speed police chase ensued during which a text message was intercepted between Sonnier and Defendant that read, “U seri *355 ous fool?” After the chase, cocaine was recovered from the roadside having been discarded from Sonnier’s vehicle during the police pursuit. Additional text and phone communications subsequent to the chase revealed Sonnier’s belief that Defendant tried to set him up given the fact that the police pursuit occurred shortly after leaving the daiquiri shop and where Sonnier indicated he had given $5,000 to Defendant. Testimony elicited at trial further established that in 2013, $5,000 would be in the price range for the amount of cocaine recovered from the side of the road that had been discarded from Sonnier’s vehicle during the high-speed chase.
Defendant does not offer an alternative hypothesis of innocence, rather, he argues that the State failed to prove his actual or constructive possession of the cocaine. The facts and circumstances, however, support the inference that Defendant constructively possessed the cocaine while inside his vehicle and that he distributed it to Thornton before the police intercepted Sonnier’s vehicle—occupied by Sonnier, Thornton, and co-defendant Williams—from which the cocaine was discarded.
The jury’s verdict reflects the reasonable conclusion that, based on the Schief-fler factors, the text and phone communications intercepted between Sonnier and Defendant leading up to the daiquiri shop meeting, the testimony of the police officer conducting the surveillance, and the physical evidence recovered from the roadside, establish, that Defendant was in constructive possession of the cocaine on November 18, 2013.[37] Accordingly, we find that viewing the evidence in the light |2flmost favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that Defendant was guilty of possession with intent to distribute cocaine. Thus, the trial court did not abuse his discretion in denying Defendant’s motion for new trial.
Denial of Motion to Suppress
Defendant argues it was error for the trial court to declare the results of the wiretap evidence admissible at trial without requiring the State to satisfy its burden of proof. Specifically, Defendant maintains that while the wiretap evidence was obtained pursuant to purported compliance with federal wiretap requirements, the wiretaps did not satisfy the requirements of the Louisiana Constitution and Louisiana’s Electronic Surveillance Act— La. R.S. 16:1301, et seq. Defendant contends that federal authorizations for electronic intercepts are not approved by a *356 judge or “attorney for a governmental entity” as required under Louisiana law. He further maintains that while federal wiretap requirements do not mandate the presentation of confidential informants to the issuing judicial authority for determination regarding credibility and reliability, the Louisiana state statute does require the informant(s) to be presented to the issuing judge. Accordingly, Defendant concludes that because the evidence obtained from the federal wiretaps were obtained in a manner wholly contrary to Louisiana law, the wiretap evidence should have been suppressed as “fruits of the poisonous tree.”
On October 23, 2015, Defendant filed a “Motion to Suppress Evidence Obtained in Violation of Louisiana Revised Statute 15:1301, et seq., and in Violation of the Louisiana Constitution Article 1, Section 5’s Right to Privacy.” On October 26, 2015, the trial court heard and denied Defendant’s motion to suppress wiretaps. In his motion and at the motion to suppress hearing, Defendant argued the federal wiretap warrants used to obtained electronic surveillance on his telephone, while procured in compliance with federal law, did not comport with the requirements set forth by the State of Louisiana under its Electronic Surveillance Act and, therefore, | ¡^should be deemed inadmissible in a Louisiana state court proceeding. Defendant cited two examples in which the federal wiretap warrants did not conform to the requirements of La. R.S. 15:1301, et seq. First, he claimed that the Louisiana act requires the signature of a state court judge for the authorization of a wiretap; and second, he claimed the federal authorization for the wiretaps did not comply with Louisiana law governing statements of informants and the requirement that any informant used in an application be presented to the issuing judge.
At the hearing, the State acknowledged that the informants were not presented to a judge for questioning; however, it noted that such requirement is unnecessary when obtaining a wiretap from a federal court judge as occurred in this case. The State maintained that the federal government obtained a valid authorization for the wiretaps in this case, having met all procedural requirements mandated by federal law.
In denying Defendant’s motion to suppress, the trial court found the rights of “the defendants are protected, and that a properly authorized federal wiretap may be used in a state court prosecution.”
In a hearing on a motion to suppress, the State shall have the burden of proof in establishing the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant. La. C.Cr.P. art. 703(D); State v. Rogers, 09-13 (La. App. 5 Cir. 6/23/09); 19 So.3d 487, 493, writ denied, 09-1688 (La. 4/9/10); 31 So.3d 382. A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent abuse of that discretion. State v. Lee, 05-2098 (La. 1/16/08); 976 So.2d 109, 122, cert. denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008); Rogers, supra.
The area of electronic surveillance is governed by federal law. The Federal Wiretap Act, 18 U.S.C. §§ 2510 et seq., was first enacted as part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and was later substantially amended by the Electronic Communications Privacy Act of 1986. See Pub.L. 90-351, 82 Stat. 212 (1968); Pub.L. 99-508, 100 Stat. 1848, 1851 (1986). This Chapter of the LsUnited States Code strictly regulates the interception and derivative use of certain protected communications and provides criminal, civil, and evidentiary sane- *357 tions for the violation of its provisions. Id. It also allows certain express exceptions to its prohibition of the interception and use of protected communications, among which is a procedure by which specified federal officials may obtain, under limited circumstances, a judicial wiretap order authorizing surveillance of protected communications. See 18 U.S.C. §§ 2517, 2518.
The Federal Wiretap Act also contains express authority for the states to adopt “little wiretap” acts authorizing their law enforcement personnel to obtain similar wiretap orders from state judges. See 18 U.S.C. § 2516(2); State v. Neisler, 94-1384 (La. 3/9/95); 655 So.2d 252, 257, reversed in part ón other grounds, (La. 1/19/96); 666 So.2d 1064. Pursuant to Title III, 18 USCA § 2516(2), states are authorized “to adopt coordinate statutes permitting the interception of wire, oral, or electronic communications, and to grant greater, but not lesser, protection than that available under federal law.” Commonwealth v. Spangler, 570 Pa. 226, 231-32, 809 A.2d 234 (Pa. 2002). See also Bishop v. State, 241 Ga. App. 517, 526 S.E.2d 917 (Ga. Ct. App. 1999); Commonwealth v. Barboza, 54 Mass.App.Ct. 99, 763 N.E.2d 547 (Mass. 2002). A state court may construe the procedural requirements of its electronic surveillance law more strictly than federal courts, thereby giving added meaning to the state’s constitutional or statutory guarantee of privacy. James G. Carr, The Law of Electronic Surveillance, § 2.4(a) (2002).
A majority of jurisdictions, including Louisiana, have followed the federal government and . enacted electronic surveillance statutes patterned after Title III. Louisiana’s Electronic Surveillance Act, La. R.S. Í5:1301, et seq., like the Federal Wiretap Act, makes unlawful the interception and disclosure of “wire,” “electronic,” or “oral” communications, as these terms are defined in the act, by “any person.” La. R.S. 15:1303(A). In the case of an “unauthorized (unlawful) interception of such communications, civil and criminal sanctions, as well as an evidentiary exclusionary | ^provision, comprise the remedies available to ‘aggrieved’ parties.” Neisler, 655 So.2d at 258. The exclusionary remedy provides that “[wjhenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding.” See La. R.S. 15:1307(A).
However, Louisiana’s Act, like its federal counterpart, contains several exceptions to its blanket prohibition of the interception of protected communications. Specifically, La. R.S. 15:1308 allows the attorney general, or the district attorney in whose district the interception will take place, to authorize an application to a state judge for an order approving the interception for the investigation of certain crimes, including violations of the Uniform Controlled Dangerous Substance Act, La. R.S. 40:961, et seq., under Which defendants in this case have been charged.
In order to obtain a wiretap under the act, a specified procedure’ must be followed. See La. R.S. 15:1310(A)-(G). In this case, Defendant argues that the state procedure concerning the presentment of the confidential informants used as a basis for obtaining the wiretap was ignored. In particular, La. R.S; 15:1310(B)(1) states:
If statements of an,identified or unidentified informant are relied upon in the application as a basis for establishing that there are reasonable grounds to believe that an offense has been, is being, or is about to be committed, the application shall set forth the factual basis for the affiant’s belief that the informant is credible and that the information has been obtained in a reliable *358 manner. The informant shall be presented to the judge and be sworn to afford the judge opportunity to inquire if the statements made in the application are true. The application shall so state that the informant was presented to the judge and sworn for such purpose. This provision shall not affect the privileged character of the identity of an informant. Nothing herein shall be construed to require the identification of a confidential informant.
(Emphasis added).
The validity of a wiretap order may be challenged in a motion to suppress, the eyidence obtained from that order. The state act delineates three scenarios when a motion to suppress may lie: (l).the communication was unlawfully intercepted; (2) the order of authorization or approval was facially insufficient;. or (3) the interception was lüpnot made in conformity with., the order of authorization or approval. La. R.S. 15:1310(H)(1).. If any of these grounds are established by the “aggrieved" party, all evidence obtained from the wiretap order must be suppressed in -accordance with La. R.S. 15:1307.
As previously mentioned, this case arose from a federal investigation conducted by a task force into drug trafficking in Jefferson Parish that resulted in federal and state indictments. Here, ■ Defendant does not contest that the wetaps in this case were lawfully obtained under federal law. However, Defendant argues their invalidity based on the failure to follow state law. He maintains, that the communication was unlawfully intercepted having failed to comply .with the procedural mandates set forth under Louisiana’s Act. In particular, he. cites to La. R.S. 15:1302(13) and 15:1310(B)(1) alleging the government’s failure to obtain.a state court judge’s authorization for the wiretap, and the failure to present the informants used in the affidavit to the judge who issued the wiretap order, in support of the suppression of the wiretap evidence. However, because the wiretap orders in this case were issued by a federal judge under federal law having complied with all the necessary federal procedural mandates for a lawful intercept, the better question is whether a lawfully intercepted federal wiretap can be used in a state court prosecution. The trial court answered this question in the affirmative, finding no law to the contrary. Had .the wiretap orders been sought and issued with the alleged deficiencies in state court pursuant to the Louisiana Act, a valid argument could potentially be made regarding their suppression.[38] However, this is not the case here.
*359 |310n its face, the Louisiana wiretap law does not prohibit the use of federally obtained wiretap evidence. However, in the absence of Louisiana jurisprudence on point, we find that a look towards, other jurisdictions for guidance is warranted.
In State v. Minter, 116 N.J. 269, 561 A.2d 570 (N.J. 1989), federal agents conducted an investigation in accordance with federal wiretap law and intercepted a telephone call that would have been admissible in a federal court proceeding. The federal agents, however, did not follow the procedures demanded of state agents under New Jersey’s wiretap law. Id. at 271, 276, 661 A.2d 670. The court noted that the failure of a state agent to comply with state law results in the exclusion of the evidence in a state prosecution. Id. at 278-79, 561 A.2d 570. Nevertheless, respecting the notion of federalism, the New Jersey Supreme Court held that since the state guidelines did hot explicitly prohibit the use of independently obtained federal wiretap evidence, and the enforcement of the state guidelines to exclude the evidence would not further privacy interests, the evidence need not be excluded. Id. at 282, 561 A.2d 570.
In reaching its' conclusion, the Minter court sought guidance from other jurisdictions that have resolved the “evolving problems of federalism attendant to differing state and federal views concerning the validity of searches.” Id. at 279, 561 A.2d 570. The New Jersey court cited to the Minnesota Supreme Court, in State v. Lucas, 372 N.W.2d 731 (Minn. 1985), indicating that an exclusionary-rule analysis would serve both to deter unlawful conduct and to vindicate fundamental state guarantees. Thus, using that analysis, the court opined, “absent participation by State officers in the search, no principles or policies of the exclusionary rule would call for the categorical exclusion from state court proceedings of wiretap evidence that has been obtained by federal officers in accordance with federal law but not state wiretap requirements.” Minter, 116 N.J. at 280, 561 A.2d 570. The court further reasoned that excluding wiretap evidence independently obtained by federal agents would not “deter unlawful conduct” because |32they lawfully obtained a federal wiretap under authorizing federal law. Id., 116 N.J. at 280-81, 561 A.2d 570. However, the case was ultimately remanded for determination of whether cooperation between state and federal officers was of such extent that the federal officers’ failure to comply with the Act required exclusion of the wiretap evidence because it was obtained for the purpose of a state prosecution and, thus, unlawfully intercepted under New Jersey Wiretap Law.[39]
in the instant matter, we also reason that absent state guidelines to the contrary, exclusion from state court proceedings of wiretap evidence obtained, lawfully by federal officers in accordance with the federal wiretap act would not promote the principles of the exclusionary rule. Thus, respecting the notion of federalism, and the consideration that exclusion of the evidence would not further the priva *360 cy interests of the citizens of the State of Louisiana, we find the trial court properly determined the evidence need not be excluded. Accordingly, the trial court did not abuse its discretion in denying Defendant’s motion to suppress.
Denial of Mistrial
In his third assignment of error, Defendant argues the trial court erred in failing to grant a mistrial when improper communication was had between a juror and the prosecutor concerning the presentation of evidence. Defendant further maintains that the failure of the trial court to admonish the jury after the State’s communication with the juror, in lieu of a mistrial, was an additional error committed by the trial court and that the jury’s verdict cannot be considered “unattributable” to this error.
On the final day of trial, during Special Agent Schliem’s testimony, the State presented various wiretap recordings to the jury. The wiretap recordings were admitted and transcripts of the recorded intercepts were published to the members of the jury. While testifying regarding the phone calls, Special Agent Schliem brought to the State’s attention that a juror was raising their hand. The juror proceeded to _j^advise the State that they had skipped one of the recordings that they had been provided within the transcribed packet of intercepts. Specifically, the juror stated “you missed 876. You went to 890.” Immediately, the trial court admonished the jury not to make any comments during the trial. The State noted that it would “go back to 876 in just one second.” Defendant then moved for a mistrial based on this interaction:
DEFENSE: I’ve going to move for a mistrial and ask for a—If it’s not granted, I’m going to ask for an admonishment to the Jury. The Jury has directly interacted with the State during the course of this' trial, messing into evidence by the Jurors instructing the State as to which exhibits they are putting forward.
They’re, obviously—no, she was obviously not going along as instructed and reading either ahead or behind, and I don’t believe it’s proper. I believe it’s grounds for a mistrial that the Juror directly communicated with the State relative to the presentation of their evidence.
So I’m moving for a mistrial and, if not, at least, at minimum, admonishment.
THE COURT: Well, I’ve already told the Jury that they’re not to interact, make any comments. I think what happened was they were handed out a stack of transcripts in order; in a particular order.
THE STATE: The transcript got stuck in my hand and I moved on to the next one not realizing that single-page transcript is a call I had skipped.
THE COURT: Yeah.
THE STATE: So I went and played the next call that showed up on the—
DEFENSE: And I caught that, as well, Your Honor. I just assumed Mr. Freese chose not to do that one.
THE COURT: I think, also, that’s #876 and you ought to put some brackets around that, so you won’t—
DEFENSE: I just assumed Mr. Freese decided not to use that call. I don’t have any control over his case, but—
THE STATE: No, it was—it was simply that, I think. You know, I think, I don’t know, I’m assuming what Í did was when I flipped from the one prior to that I turned that one over, as well.
DEFENSE: I just need to make my record, then.
J^THE COURT: Understood.
*361 DEFENSE: Given the interaction between the State and one of the Jurors, I’m making my Motion for Mistrial, again, and the Court can rule any way it wishes.
THE COURT: The Court doesn’t believe it’s grounds for a mistrial. Your motion is denied and is noted for the record.
A mistrial is a drastic remedy and should be declared only when unnecessary prejudice results to the accused. State v. Alexander, 351 So.2d 505 (La. 1977); State v. Governor, 331 So.2d 443 (La. 1976). La. C.Cr.P. art. 775 provides, in pertinent part, that “[ujpon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770[40] or 771.[41]” (Internal footnotes added). It has been consistently held that when the conduct does not fall within the mandatory mistrial provisions of La. C.Cr.P. art. 770, lanthe judge has the sound discretion to determine whether the activity or comment so prejudiced the defendant that he could not receive a fair trial. State v. Talbot, 408 So.2d 861, 866 (La. 1980).
A defendant’s constitutional right to a fair trial by an impartial jury may be violated where jurors are subjected to influences which cause them to base their verdict on factors other than the evidence admitted at trial. Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); State v. Bibb, 626 So.2d 913, 922 (La. App. 5th Cir. 1993), writ denied, 93-3127 (La. 9/16/94); 642 So.2d 1888. Any unauthorized communication made by a non-juror to a juror (directly or indirectly) during trial about the matter pending before the jury' is deemed presumptively prejudicial. State v. Marchand, 362 So.2d 1090 (La. 1978); Bibb, supra; State v. *362 Baker, 582 So.2d 1320 (La. App. 4th Car. 1991), writ denied, 590 So.2d 1197 (La. 1992), cert. denied, 506 U.S. 818, 113 S.Ct. 62, 121 L.Ed.2d 30 (1992). However, a new trial is warranted only upon a showing that a constitutional violation occurred and a reasonable possibility of prejudice exists. State v. Day, 414 So.2d 349 (La. 1982); Bibb, supra; Baker, supra.
In State v. Chairs, 466 So.2d 647 (La. App. 5th Cir, 1985), the defendant argued on appeal (that the trial court erred in denying his motion for a mistrial following the asking of a question by a juror. During the trial, the defendant took the stand and on cross-examination by the prosecutor was asked to hold his hands as if he were holding a gun. As the defendant was complying with. the. request, a juror asked the defendant if he was right handed, to which the defendant replied in the affirmative.Thereafter, the defense moved for a mistrial based upon the exchange between the defendant and the juror. In denying the mistrial, the trial court found the question was not elicited by the 'defense or the State-and that the question and answer did not rise to the level of prejudice warranting a mistrial. Thus, the trial court provided an admonition to the jury to disregard the question asked by the juror and the answer provided by the defendant. This Court agreed, finding there was no prejudice resulting to the L,¡defendant and that the trial court properly denied the defense’s motion for a mistrial.
In Chairs, a more egregious question was asked by a juror than the comment made by the juror in the instant matter advising the State of a missed recording that had previously been provided to the jurors in a transcribed packet. Moreover, after the comment was made, the trial court admonished the juror not to interact or make any comments during the trial. Thus, as in Chairs, supra, we find the comment made by the juror was neither elicited by the defense nor the State and that the comment did not rise to the level of prejudice warranting a mistrial. Accordingly, we determine that the trial court properly denied Defendant’s motion for a mistrial.
Excessive Sentence
In his final assignment of error, Defendant argues his original 50-year sentence and his enhanced 65-year sentence as a second felony offender on his conviction-for racketeering (count one) is excessive. He compares his original 50-year sentence to -that of co-defendant Williams, who received the same underlying sentence for racketeering, maintaining that the trial court failed to justify why the sentences were the same for himself and his co-defendant who was the leader of the Harvey Hustler gang. He maintains that his connection to racketeering and the crimes committed by the Harvey Hustler gang was tenuous at best and, accordingly, did not justify the trial court’s imposition of the excessive 65-year enhanced sentence.
It is noted that Defendant’s motion for appeal was filed on December 9, 2015, prior to fhe habitual offender proceedings' held on December 17, 2015; and, although Defendant’s motion for appeal was granted after the imposition of his enhanced sentence on December 17, 2015, his written motion for appeal specifically sought to appeal the guilty verdicts rendered on -November 6, 2015, and the original sentences imposed on November 18, 2015. Thus, Defendant’s 65-year habitual offender sentence on count one is not before this Court on appeal. Accordingly, only the |37excessiveness of Defendant’s original sentence on count one has. been ad *363 dressed.[42]
Failure to make or file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a.review of.the sentence for constitutional excessiveness only. State v. Bolden, 04-1000 (La. App. 5 Cir. 3/1/05); 901 So.2d 445, 447, writ denied, 05-2030 (La. 4/28/06); 927 So.2d 279. See also La. C.Cr.P. art. 881.1(E). In this case, although the record reflects that Defendant orally objected to his original sentence on count one as excessive, Defendant did not file a motion to reconsider sentence. Accordingly, the issue is whether Defendant’s sentence is constitutionally excessive. See State v. Alvarez, 11-223 (La. App. 5 Cir. 11/15/11); 78 So.3d 265, 268, writ denied, 11-2767 (La. 4/13/12); 85 So.3d 1245.
The Eighth Amendment to the Ü.S. Constitution, and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. State v. Nguyen, 06-969 (La. App. 5 Cir. 4/24/07); 958 So.2d 61, 64, writ denied, 07-1161 (La. 12/7/07); 969 So.2d 628. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate' to the severity of. the offense or imposes needless and purposeless pain and suffering. Nguyen, 958 So.2d at 64. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and. gauge whether the | ¡^penalty is so disproportionate as to shock the sense of justice. State v. Taylor, 06-839 (La. App. 5 Cir. 3/13/07); 956 So.2d 25, 27, writ denied, 06-0859 (La. 6/15/07); 958 So.2d 1179 (citing State v. Lobato, 603 So.2d 739, 751 (La. 1992); State v. Pearson, 07-332 (La. App. 5 Cir. 12/27/07); 975 So.2d 646, 655-56).
According to -La. C.Cr.P. art. 881.4(D), the appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. In reviewing a sentence for excessiveness, the re *364 viewing court shall consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice, while recognizing the trial court’s wide discretion. Nguyen, 958 So.2d at 64. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Allen, 03-1205 (La. App. 5 Cir. 2/23/04); 868 So.2d 877, 880. However, there is no requirement that specific matters be given any particular weight at sentencing. State v. Tracy, 02-0227 (La. App. 5 Cir. 10/29/02), 831 So.2d 503, 516, writ denied, 02-2900 (La. 4/4/03); 840 So.2d 1213.
Defendant challenges the excessiveness of his original and enhanced sentences on count one—racketeering. As previously discussed, Defendant’s enhanced sentence is not before this Court on appeal; thus, only the alleged excessiveness of his original sentence will be addressed.
At the time of the charged offense, the penalty for racketeering under La. R.S. 15:1354(A) was a fine of not more than $1,000,000, or imprisonment at hard labor for not more than 50 years, or both. Defendant was initially sentenced on the racketeering offense, to the maximum sentence of 50 years imprisonment at hard labor.
When originally sentencing Defendant, the trial court heard argument from Defendant’s counsel requesting that the court consider the fact that he did not have a “lengthy criminal history,” no convictions for crimes of violence, and was not the [39main supplier for the cocaine distribution organization in Jefferson Parish. After considering the argument of counsel, the testimony of the numerous witnesses, the exhibits admitted into evidence, the verdict of the jury, and the sentencing guidelines set forth under La. C.Cr.P. art. 894.1, the trial court found:
the Defendants are in need of correctional treatment, that there is an undue risk that the Defendants would commit other crimes, that the Defendants received, offered, or gave money for the commission of their offenses, that the offenses included controlled dangerous substances, and the offenders obtained substantial income from drug activities, that the Defendants were members of or associated with a criminal enterprise involved in a pattern of racketeering activity that included distribution of both Schedule 1 and Schedule 2 controlled dangerous substances and murder.
The review of sentences under La. Const, art. 1, § 20 does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is most appropriate in a given case. State v. Williams, 07-1111 (La. 12/7/07); 969 So.2d 1251, 1252 (per curiam). Further, when an appellate court is reviewing a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200 (La. 10/12/01); 799 So.2d 461, 462 (per curiam).
In the instant case, we find that Defendant’s original sentence on count one is not constitutionally excessive.
Defendant argues his original sentence was the same as that of his co-defendant Williams, whom he avers was the leader of the Harvey Hustlers while he himself only. “happened to be caught up as a drug dealer” and was never a member of the Harvey Hustler gang. While the record does reflect that co-defendant Williams received the same original 50-year sentence on his conviction for racketeering, as a general rule, the fact that a co-defendant has re *365 ceived a more lenient sentence does not necessarily indicate that the penalty imposed on the defendant is excessive. State v. Tate, 01-1658 (La. 5/20/03); 851 So.2d 921, 940, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). In any case, we find, and the record establishes, that Defendant’s involvement in the narcotics enterprise was still quite substantial, despite |4nthe fact that he was only a known associate of the Harvey Hustler gang.
Here, Defendant was convicted of racketeering, conspiracy to distribute cocaine, and possession with intent to distribute cocaine. The evidence adduced at trial supports the trial court’s summary of the facts of the case. The.trial court determined that the sentence imposed on Defendant’s racketeering conviction was based upon his need for correctional treatment, the fact that there existed an undue risk that Defendant would commit other crimes, and that his motive was greed surrounding a criminal enterprise that dealt in the purchasing and distribution of controlled dangerous substances. Further, various witness testimony including that of Carter and Holmes, confirmed Defendant’s significant role in the transportation and distribution of wholesale amounts of cocaine to Harvey Hustler members. At trial, Holmes and Carter explained that they would transport more than 20 kilograms of cocaine per month to Jefferson Parish, primarily paid for by Defendant.
Accordingly, the record amply justifies the original 50-year sentence imposed by the trial court on Defendant’s racketeering conviction and is not grossly disproportionate to the offense or impose needless and purposeless pain and suffering. Such penalty does not shock this Court’s sense of justice. Thus, we find the trial court did not abuse its discretion in imposing this sentence.
Errors Patent Discussion
The record was reviewed for errors patent, according to La. C.Cr.P. art.. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La. App. 5th Cir. 1990).
Defendant was convicted, on count two, of conspiracy to distribute cocaine, violations of La. R.S. 40:967(A) and La. R.S. 40:979. Sentencing under La. R.S. 40:967(B)(4)(b) and La. R.S. 40:979(A) require “the first two years” of the sentence to be served: without benefit of parole, probation, or suspension of sentence. In this case, when the trial- judge sentenced Defendant on count two, he did not specify that the first two years of Defendant’s 15-year sentence was to be served without benefit |41of parole, probation, or suspension of sentence. Thus, Defendant received an illegally lenient sentence. However, the trial court’s failure to state this requirement at sentencing need not be corrected on remand because under State v. Williams, 00-1725 (La. 11/29/01); 800 So.2d 790, 799 and La. R.S. 15:301.1(A), the “without benefits” provision is self-activating.[43]
Next, the habitual offender bill of information alleged that Defendant had previously been charged with violating La. R.S. “40:967(B), Possession of More Than 28 Grams of Cocaine” and that Defendant thereafter pleaded guilty to the lesser *366 charge of possession of cocaine, in violation of La. R.S. 40:967(0). While the habitual bill correctly sets forth the statutory citation for the underlying conviction Defendant pleaded guilty to (possession of cocaine), it contains the incorrect statutory citation of the original charge of possession of more than 28 grams of cocaine, which should have read La. R.S. 40:967(F) and not 40:967(B). ■
The purpose of a bill of information is to inform a defendant of the nature and cause of the accusation against him as required by the Louisiana Constitution, Article 1, § 13. A clerical error in the statutory citation does not require a dismissal of the bill or reversal of a conviction if the error or omission does not mislead defendant to his prejudice. La. C.Cr.P. art. 464; State v. Anderson, 561 So.2d 189, 191 (La. App. 5th Cir. 1990); State v. Conner, 08-0473 (La. App. 4 Cir. 10/1/08); 996 So.2d 564, 569.
In the present case, there is no indication that Defendant was prejudiced by the incorrect statutory citation for the crime of possession of more than 28 grams of cocaine, an underlying charge which he did not eventually plead guilty to. The habitual offender bill correctly stated Defendant pleaded guilty to the lesser charge of possession of cocaine, in violation of La. R.S. 40:967(C), and the habitual offender bill contained the correct case number, section of court, and date of his underlying 14aconviction and sentencing for the lesser charge. Thus, we find the error in the statutory citation of the underlying charged offense in the habitual offender bill is harmless. See State v. Sam, 11-470 (La. App. 5 Cir. 2/14/12); 88 So.3d 587; State v. Varnado, 01-367 (La. App. 5 Cir. 9/13/01); 798 So.2d 191.
Finally,' the State of Louisiana Uniform Commitment Order reflects the incorrect sentencing date. The habitual offender uniform commitment order reflects a sentence date of “11/17/2015 as to the multiple bill,” when the date of the habitual offender bill resentencing was December 17, 2015.
This Court has previously remanded a case for correction of the uniform commitment order in its error patent review. See State v. Lyons, 13-564 (La. App. 5 Cir. 1/31/14); 134 So.3d 36, writ denied, 14-0481 (La. 11/7/14); 152 So.3d 170 (citing State v. Long, 12-184 (La. App. 5 Cir. 12/11/12); 106 So.3d 1136, 1142). Accordingly, we remand this matter and order that the habitual offender uniform commitment order be corrected as to the habitual offender bill sentencing date. We further direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected habitual offender uniform commitment order to the officer in charge of the institution to which defendant has been sentenced and the Department of Corrections’ legal department. See Long, 106 So.3d at 1142 (citing La. C.Cr.P. art. 892(B)(2)).
DECREE
For the foregoing reasons, Defendant’s convictions and ■ sentences are affirmed. The matter is remanded to the trial court for correction of the uniform commitment order as directed in this opinion.
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT
WICKER, J., CONCURS AND ASSIGNS REASONS .
LILJEBERG, J., CONCURS WITH REASONS WITH WHICH WICKER, J. JOINS

. Co-defendant Robert Williams’ appeal is pending before this Court under companion case number 16-KA-417.

. Co-defendant Williams was charged, with racketeering (count one), attempt or conspiracy to distribute cocaine (count two), conspiracy to distribute heroin and marijuana (count three), two counts of possession of a firearm by a convicted felon (counts fifteen and eighteen), illegal possession of a stolen firearm (count sixteen), arid possession with intent to distribute cocaine (count nineteen).

. Criminal charges had not been brought in relation to these murders; however, several suspects were developed, including the Hudson brothers and Paul Smith.

. Steven Collins testified that in 2012 he owned a firearm that was stolen from the glove compartment of his vehicle. He stated that he reported the gun stolen and provided the police with its serial number. Mr. Collins further indicated that co-defendant Williams did not have his permission to take or possess his firearm at any time.

. Smith’s statement "like lást time,” references an earlier November 8, 2013 wiretap conversation between Sonnier and Carter regarding a meeting in front of the "Dale,” which Special Agent Schliem believed to be a reference to the Scottsdale neighborhood.

. Based upon his investigation, Special Agent Schliem believed "work your magic” to mean "someone that would take powder cocaine and cook it in the—in 'a cocaine base, or crack cocaine."

. Agent Boudreaux testified that he was able to identify Sonnier and co-defendant Williams from prior surveillances where he had observed the pair at various meeting locations engaging in activity consistent, with narcotics trafficking.

. Agent Boudreaux testified that co-defendant Williams was dressed in all red, and is "quite short,” so he was "very observable when he walked up to the rest of the group.”

. Co-defendant Williams was standing a few feet away and within hearing distance of their conversation.

. Chemical testing revealed that the substance was synthetic marijuana.

. Pamela Williams-Cyprián of the JPSO Crime Laboratory testified as an expert in the identification and analysis of controlled dangerous substances. She testified that the contraband found inside the Mazda and along the route driven by the Mazda tested positive for cocaine, and State's Exhibit 29 tested positive for a synthetic cannabinoid called AB-Fubi-naca aka “mojo." She further testified that State’s Exhibit 28 contained two different types of "mojo” (AB-Pinaca and AB-Fubina-ca).

.Motton was in possession of the key to the Mazda at the time of his arrest.

. Donna Quintanilla of the JPSO Crime Laboratory testified as an expert in latent fingerprint comparison and analysis. Ms. Quintanil-la told the jury that she matched co-defendant Williams' fingerprints to those affixed to certified court records for a 2001 conviction for simple burglary and a 2006 conviction for possession of a firearm by a convicted felon.

. The confidential informant was identified as Nicole Newton, Her identity was revealed because she was suffering from terminal cancer. Marcel Folse of the JPSO Crime Laboratory testified as an expert in the analysis and identification of controlled dangerous substances. Folse testified the narcotics used in the undercover buys tested positive for cocaine.

. Special Agent Schliem testified that the term "racks” is a word used in the "drug world for increment[s] of $1,000.”

. Special Agent Schliem testified that "Bull” is Defendant’s nickname.

. Co-defendant Williams is depicted wearing a chain with the letters "HH” around his neck.

. Richardson stated that he hoped his testimony would result in a reduction of his sentence.

. Richardson defined "slabs” as costing $50, which he would then break down into "rocks” and sell them for $10 to $20 per rock.

. Reynard also stated that he hoped his testimony would result in a reduction of his sentence.

. Defendant told Sergeant Nance that the vehicle belonged to Nathan Carter.

. Michael Cole of the JPSO Crime Laboratory testified as an expert in the analysis and identification of controlled dangerous substances and told the jury that State’s Exhibit 77 tested positive for cocaine and contained a total net weight of approximately 7½ kilograms.

. Holmes testified that he would travel to Houston to retrieve the narcotics approximately five or six times per month.

. Holmes indicated. that in November of 2013, Defendant was living in the St. Ger-maine apartment complex but that he would pick up the money for the narcotics from Defendant at a house on Friendship Drive in Harvey in the months leading up to their April 2014 arrest, At times the -quantity of mopey exceeded $200,000..

. Special Agent Schliem also identified a music video entitled "Every Snitch,” depicting David Williams aka "Mr. Harvey,” Tory Richardson, Kentaz Gayden aka "Kenny Boo,” Paul Smith aka "Buck," Carlnell Pierce, Tedrick Reynard, and Chad Jones.

. Kerry Walker, records custodian for Sprint Corporation, provided phone records for telephone number (504) 236-7867, belonging to Donte Hall.

. Defendant paid the rent and security deposit for the apartment.

. Ms. Toussaint leased the apartment from April 30, 2013 until March 1, 2014.

. On cross-examination Bird admitted that he was originally brought in for questioning as a suspect in Hall’s murder because of the similarities between his vehicle and the white car seen following the black Infiniti.

. Maya’s mother, Marshanda Jackson,' testified that on the day before Hall was murdered, she saw him enter Defendant’s car, remain inside for approximately seven to ten minutes, and then exit the car. She further testified that on the day of Hall’s murder, her daughter Maya reported to her that Hall had left the neighborhood with Defendant and that a "white car went flying behind them.’’
Jeanine Gonzales also testified that while driving on Lafitte Highway, a black vehicle followed by a white vehicle passed her at a very high rate of speed.

. Detective Travis Eserman testified that there were 36 phone calls between the phone number associated with Defendant’s and Hall’s phone numbers between November 14, 2013 and Hall’s death on November 16, 2013. In the same period, there were also 26 phone calls between Defendant and Carter.

. On April 25, 2016, the State dismissed the second degree murder charge for the death of Donte Hall (count seventeen) against Defendant;

. Co-defendant Williams was found guilty as charged on all counts.

. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial, Id. Therefore, the sufficiency of the evidence is addressed before Defendant’s other assignments of error. See also State v. Nguyen, 05-569 (La. App. 5 Cir. 2/3/06); 924 So.2d 258, 262.

. Defendant failed to file a motion for post-verdict judgment of acquittal challenging the sufficiency of the evidence pursuant to La. C.Cr.P. art. 821. Although he filed a motion for new trial, procedurally there is a distinction between the two motions. However, such failure does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La. 1982); State v. Brown, 01-41 (La. App. 5 Cir. 5/30/01); 788 So.2d 694, 699.

. However, a review of the record under State v. Raymo, 419 So.2d 858, 861 (La. 1982), reflects the State presented sufficient evidence to establish the remaining statutory elements of the crime.

. See State v. Williams, 11-1298 (La. App. 4 Cir. 6/20/12), 97 So.3d 428, writ denied, 12-1672 (La. 2/8/13), 108 So.3d 78, where the defendant contended on appeal that the evidence was insufficient to establish that he knowingly possessed cocaine with the intent to distribute it. On appeal, the Fourth Circuit found that although the defendant was not found to be in possession of the crack cocaine at the time of his arrest, the evidence at trial was sufficient to establish his guilt beyond a reasonable doubt. The court noted that the jury heard testimony from a detective that during surveillance of an area known for drug trafficking, he observed the defendant engage in two transactions where the visitor would hand the defendant currency and in turn would receive "an object” from, the defendant. Although the-defendant was never found in possession of crack cocaine, the court held that it could be inferred from the testimony that the defendant knowingly and intentionally distributed crack cocaine to the two buyers who were apprehended with crack cocaine in their pockets. Moreover, the court went on to note that currency of various denominations was found in the defendant's pocket, supporting a reasonable inference -that the defendant distributed the crack cocaine to the two buyers and had used up his crack cocaine supply momentarily, Accordingly, the court concluded that the evidence supported the finding that the defendant possessed the cocaine with the intent to distribute it.

. See State v. Neisler,94-1384 (La. 1/18/96); 666 So.2d 1064, where, oh original hearing, the Louisiana Supreme Court suppressed evidence obtained from wiretaps because the officers failed to comply with the state Act's mandatory requirement that the officers present their confidential informant to the issuing judge. See State v. Neisler, 655 So.2d 252 (La. 1995), On rehearing, the court recognized that the officers technically violated the state Act, Neisler, 666 So.2d at 1068, The court held, however, that "the necessity for suppressing evidence under the exclusionary rule of Section 1307 is an entirely separate question,” Id. The court further held, "[t]he crucial issde becomes whether evidence must be suppressed .. > in every case of a failure to follow every statutory requirement [of the pertinent section of the state Act] in obtaining a wiretap order.” Id. In reversing its prior holding, the court relied on case law in which the court had recognized that a search warrant may be valid even when the supporting affidavit contained inaccurate information,' if suppressing the evidence would not deter deliberate and fraudulent police behavior. Id. (citing State v. Rey, 351 So.2d 489 (La. 1977)). The Neisler court concluded that it must arrive at a "reasonable and just accommodation between an accused’s interest in limiting invasions of his or her privacy to .those based upon a magistrate’s determination of probable cause and society’s interest in using reli *359 able evidence to convict those who violate criminal laws.” Id. (citing State v. Lehnen, 403 So.2d 683, 686 (La. 1981)). Finally, in affirming the court of appeal's decision not to suppress the evidence, the court stated that suppression "is simply too high a price to pay to assure technical compliance with a statute whose purpose was otherwise served by the commendable police work in the present case." Neisler, 666 So.2d at 1069.

. In the matter at bar, Defendant did not allege or present any evidence of any collusion between the federal and state agents. Thus, unlike the New Jersey court, we decline to remand the case for any further inquiry on that issue.

, The challenged conduct does not fall within any of the mandatory mistrial provisions delineated under La. C.Cr.P. art. 770. Specifically, La. C.Cr.P. art. 770 provides:
Upon motion of a defendant-, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or (4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an'admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

. La. C.Cr.P. art. 771 provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when, the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defenddnt, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770. In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
(Emphasis added). The present situation is' covered by article 771(2).

. But see State v. Luckey, 16-494, 2017 La. App. LEXIS 171 (La. App. 5 Cir. 2/8/16), where this Court addressed the defendant's assignments of error concerning his convictions and conducted a full error patent review despite the defendant’s “notice of appeal,” which did not indicate that the defendant sought to appeal his convictions, having only referenced the date of his sentencing in his notice of appeal. In reaching this conclusion, this Court found that although the defendant did not explicitly seek review of his convictions in his notice of appeal, the defendant’s sole assignments of error pertained only to his convictions, and "the Louisiana Supreme Court has recognized that appeals are favored in the law and has disapproved of the dismissal of appeals on ‘hypertechnical’ grounds” Id. (citing State v. Armant, 02-907 (La. App. 5 Cir. 1/28/03); 839 So.2d 271, 274, citing State v. Bunnell, 508 So.2d 55 (La. 1987)).
Although distinguishable from Luckey, supra, which pertained to an appeal concerning the defendant's convictions and not to a separate habitual offender proceeding which occurred after the filing of the motion for appeal as in this case, it is nevertheless noted that under the facts of the instant matter, Defendant’s enhanced sentence on count one is not excessive. As a second felony offender, under La. R.S. 15:1354(A) and La. R.S. 15:529.1, Defendant was facing an enhanced sentencing range of 25 to 100 years imprisonment. Accordingly, Defendant’s enhanced 65-year sentence is 35 years below the maximum sentence that could have been imposed for a second felony offender with an underlying racketeering conviction, It is further noted that Defendant's 65-year sentence is ten years less than the 75-year enhanced sentence imposed on co-defendant Williams, despite Defendant's complaint that he and co-defendant Williams received the same underlying sentence for racketeering. While a 65-year sentence as a second felony offender with an underlying racketeering conviction has not been specifically addressed by the jurisprudence, the facts of this case and the jurisprudence cited with respect to Defendant’s original sentence on count one support the enhanced sentence imposed.

. Notably, despite the trial court's failure to impose the requisite statutory restrictions when sentencing Defendant on count two, the original commitment correctly states that the first two years of Defendant’s 15-year sentence on count two is to be served without benefit of probation, parole, or suspension of sentence. As discussed, because the "benefits provision” is self-activating, this discrepancy accurately reflects the restrictions that should have been imposed and, thus, should not be corrected.